Matter of THE UNION BANK OF BROOKLYN, in Liquidation.

Matter of the Application of EUGENE LAMB RICHARDS, as Superintendent of Banks of the State of New York, for Leave to Declare and Pay a Dividend to the Creditors of the UNION BANK OF BROOKLYN.

(Supreme Court, Kings Special Term, July, 1916.)

Banks — superintendent of — power of superintendent to carry real estate investments — receivers — foreclosure — power to declare dividend to general creditors upon claims as proved.

Primarily, the superintendent of banks is an administrative state officer exercising supervisory and visitorial powers in the licensing, regulating and closing of the institutions subject to his control. While occupying that status and exercising such powers his discretion is not the subject of judicial review.

When, or if, the superintendent determines that a banking institution is no longer solvent and takes possession of it for the purpose of liquidation, there springs up a new and different status and there devolve upon him new functions and different duties. He instantly assumes the position of a receiver and from that moment, except as the statute expressly gives him power to do certain things, he becomes the arm of the court and does not possess nor can he exercise any judgment or discretion.

While it is his duty to " liquidate " the assets, ascertaining the validity of claims presented and paying creditors, it is his duty also before paying out any moneys to obtain the sanction and approval of the court.

The administration and liquidation of the affairs of the Union Bank of Brooklyn from April, 1910, to May 1, 1916, under successive superintendents of banks, criticized on the ground of expenses of administration and especially in the payment of legal expenses incurred without the sanction of the court.

Payments made by said superintendent out of the assets of said bank to one occupying the position of assistant district attorney and drawing a salary as such were illegal in so far as intended as compensation for services having relation to the discharge of duties as assistant district attorney.

The policy of the said superintendent and his successors in continuing without the sanction of the court to carry real estate investments of said bank, being assets of doubtful value, using liquid assets of the institution for the purpose and piling up a deficit by such retention, criticized.

Completion of the liquidation of the affairs of said Union Bank of Brooklyn without further delay directed. To that end the superintendent directed to sell before September, 1916, all unsold real property of the bank, including all property belonging to it but carried in the names of its subsidiary corporations; foreclosure directed of mortgages now held, which are in default as to principal, interest or taxes; also sale of securities, including choses in action, still held as part of the assets of the bank.

Order granted that said superintendent be directed to declare out of the funds remaining in his hands, after payment of expenses, a dividend to the general creditors in the amount of five per centum upon their claims as proved.

APPLICATION by petitioner for an order directing him to declare and pay out of the funds of the Union Bank of Brooklyn, now in his possession, a dividend of five per centum upon the claims allowed, etc.

Joseph G. Deane, for petitioner.

John MacCrate and Forrest S. Chilton (Louis Goldstein, of counsel), for Depositors' Committee of the Union Bank.

BENEDICT, J. The petitioner prays that " an order may be made herein authorizing and directing him to declare and pay out of the funds of the Union Bank of Brooklyn, now in his possession available for such purpose, a dividend of five per centum upon the claims allowed, less any offsets which may be claimed or ascertained against any of such creditors, and, further, that your petitioner be authorized, in his discretion, to pay the amount of this dividend upon all claims which may hereafter be allowed by him against said Union Bank of Brooklyn."

Notice of the application was given as required by statute, and upon the return thereof before this court the depositors' committee, orally and in writing, stated their objections to the granting of the application upon the ground, among others, that the amount of the proposed dividend was insufficient, and that a larger dividend should be declared and paid; and requested the court to refer the matter to an official referee to examine the accounts of the petitioner and his predecessors in the office of superintendent of banks, to the end that the court might determine whether a larger dividend than five per centum should not be authorized and directed.

Thereupon the court, by its memorandum filed April 24, 1916, stated that, in view of the fact that no accounting had been had of the proceedings of the petitioner or of his predecessors in the office of superintendent of banks from the time when the Union Bank of Brooklyn was taken possession of on April 4, 1910, down to the time of the presentation of the petition for leave to pay the initial dividend to the creditors of the bank, it was not possible for the court to discharge the duty, imposed upon it by the statute, of judicially determining what dividend the superintendent of banks should be authorized to pay and to whom it should be paid and the priority and amount of such payment, because the court had not before it sufficient facts to determine, except in a perfunctory way, whether the proposed dividend of five per centum was a proper one to be authorized.  The court, thereupon, adjourned the application to a later date to afford the persons in interest an opportunity to present further evidence for or against the application, and thereby to avoid the necessity, which otherwise would have arisen, of denying the application for lack of sufficient information concerning the administration of the trust estate in the hands of the petitioner.

The court, upon the 1st of May, 1916, at the first adjourned hearing, requested the petitioner to furnish, for the information of the court, a statement in detail showing what disposition had been made by the superintendent of banks and his predecessors in office of each item of property, real and personal, which comprised the assets of the Union Bank on April 4, 1910, the date upon which the superintendent of banks then in office had taken charge of it under the provisions of the Banking Law of the state. And the court also requested that it be furnished with a statement of all payments that had been made by the superintendent of banks and his predecessors in office for and on account of the Union Bank of Brooklyn, and under what authority the payments had been made, and what property remained in the hands of the superintendent at the present time.

As a result of the request so made by the court, the superintendent of banks has, from time to time, at later hearings, furnished the court with the detailed statements requested by it. All these are filed with this memorandum.

Upon the twenty-seventh day of May the petitioner submitted to the court two volumes of accounts which have been marked respectively petitioner's Exhibits 1 and 2. Exhibit 1 is a copy of the inventory of the assets of the Union Bank of Brooklyn on April 4, 1910, as filed on August 20, 1910, in the office of the clerk of the county of Kings by O. H. Cheney, the superintendent of banks of the state of New York then in office, verified by his oath. Upon the copy so submitted to the court, the petitioner had caused to be written memoranda showing the disposition which had been made in the course of administration by himself and his predecessors in office of each of the items comprised in the various schedules which were contained in the

inventory, and showing which items had been collected, in whole or in part, and which of them remained in his hands uncollected upon the 1st day of May, 1916.

Exhibit 2, also submitted at the same time, was an account containing, in different schedules, the following:

1. A summary statement of the information given in volume 1.

2. A summary and detailed statement of the cash receipts and disbursements.

3. A summary and detailed statement of all expenses paid during the period from April 4, 1910, to May 1, 1916.

4. A summary and detailed statement of advances made to protect equities during the period from April 4, 1910, to May 1, 1916.

5. Schedules 1 to 10, showing the uncollected loans and bills discounted and other remaining assets as of May 1, 1916, with the book values stated in connection with each item, the same book values reported in the inventory of April 4, 1910, being maintained throughout the liquidation and being reflected in these schedules as of May 1, 1916.

6. Schedule 11 shows liabilities on the books as of May 1, 1916.

Incidentally, it may be stated, that volume 1 so submitted contains more than 140 pages of folios of figures, and that volume 2 comprises 159 similar pages.

At the request of the court the petitioner supplied the like information to the attorneys for the depositors' committee, and the court gave to these attorneys a reasonable opportunity, viz.: from May twenty-seventh to June fifth, to examine the accounts.

On the last-mentioned date they requested further time and further information.

Upon June fifteenth, the attorneys for the deposit-

Supreme Court, July, 1916.          [Vol. 96.

ors' committee stated to the court in writing certain objections to the statements of account which had been submitted to the court by the petitioner and withdrew in open court all other objections, oral or in writing, which had been presented to the court during the hearing of this application, stating that there were, in the opinion of the attorneys, no other matters that needed to be looked into by the court. A copy of the memorandum of the objections is filed herewith marked Exhibit 3.

The court, at the same hearing, gave to the counsel for the superintendent of banks a statement which it had formulated from its own examination of the accounts submitted, and requested to be furnished with the information pointed out in such memorandum. A copy of the memorandum is filed with this opinion and marked Exhibit 4.

The proceeding was thereupon adjourned until June twenty-first, in order to enable the petitioner to furnish the information called for by Exhibit 4.

On June twenty-first the petitioner filed with the court two additional statements, the first, marked Exhibit 5, containing a statement covering a portion of the information so requested, and the other, marked Exhibit 6, being a statement concerning the receipts and disbursements made on account of the Metropolitan Holding Company, one of the subsidiary corporations controlled by the Union Bank of Brooklyn.

On June twenty-seventh the petitioner furnished to the court a statement, marked Exhibit 7, comprising forty-two folios or pages, containing an analysis of the expenses of real estate. He also submitted statements and memoranda referring to the legal services stated to have been rendered to the petitioner as superintendent of banks or to his predecesors in office, by Rollins & Rollins, Louis Goldstein, and Joseph G. Deane.

On July 5, 1916, the petitioner furnished to the court the final statements of account which had been called for. These were a statement, marked Exhibit 8, comprising 112 folios or pages, of the receipts and disbursements made on account of the Shetland Company, and a statement, marked Exhibit 9, comprising 42 folios or pages, being a supplement to Exhibit 5 above mentioned.

Since April 4, 1910, three superintendents of banks have, in their official capacity, had charge successively of the liquidation of the Union Bank of Brooklyn. They were respectively in charge as follows: O. H. Cheney from the date of closing, April 4, 1910, until May 23, 1911; George C. Van Tuyl, Jr., from May 23, 1911, to May 9, 1914, and Eugene Lamb Richards, from May 9, 1914, to the present time.

During the six years in question, no accounting of any kind has been made, either to this court or to the creditors of the Union Bank, concerning the administration by the superintendents, or any of them, of the assets and affairs of this insolvent institution; and no dividend has been declared or paid to the general creditors of the bank. The verified petition presented to the court on this application contains the statement that, on March 31, 1916, there were in the hands of the petitioner............................. $223,127 56

Deducting preferred claims ............    13,204 52

                                         _____
                                          $209,923 04
Amount necessary for dividend requirement............................    182,151 03

                                         _____
Leaving a net available cash balance of..  $27,772 01
                                         ===========

20

Supreme Court, July, 1916.    [Vol. 96.

to cover certain claims referred to and for a working balance for the general purposes of the liquidation, besides the unliquidated assets of the bank. It was further stated that the value of these unliquidated assets, "while not yet definitely determined is sufficient, in the opinion of the petitioner, to cover any possible amounts allowed upon the disputed claims and the expenses of the liquidation."

The petition also stated that the claims allowed to February 16, 1916, amounted to $3,381,215.70.

And it was further stated that the following additional claims had been rejected by the petitioner, to wit:

| | |
|---|---:|
| Paul Grout, attorney's fees | $39,788 39 |
| David Leggett, balance of rent | 10,200 00 |
| Ephraim A. Walker | 1,000 00 |
| Bart Dunn | 1,000 00 |
| O'Brien, Boardman & Platt | 1,000 00 |
| Idaho Maryland Development Company. | 12,500 00 |
| John M. Reiner | 12,500 00 |
| St. Augustinian College of Villa Nova.. | 12,500 00 |

With regard to the three items last mentioned, they appear to be conflicting claims to the same fund.

It stated that among other disputed claims was an additional claim of Louis Goldstein for balance claimed to be due him for professional services rendered to the superintendent of banks, amounting to $18,550, but which the petitioner stated that he was advised and believed "can possibly be liquidated at much less than the amount of the claim as made."

The petition was entirely silent both as to the gross amount of moneys received and paid out by the several superintendents who had had charge of the bank and also as to what disposition had been made of the assets

of the bank during the six years of liquidation which had supervened since Superintendent Cheney took the bank in charge.

As the first step in getting information as to what these assets were when the bank was closed the court consulted the verified inventory filed by Superintendent Cheney on August 20, 1910, on file in the office of the clerk of Kings county. It appeared by the inventory that the superintendent had ascertained that these assets amounted to the sum of $7,310,653.56 in book values as of April 4, 1910. This sum was the aggregate of the amounts set forth in the schedules comprising the inventory, as follows:

| | | |
|---|---|---:|
| Schedule A. | Demand loans ......... | $2,771,521 94 |
| Schedule B. | Time loans ............ | 244,774 38 |
| Schedule C. | Bills discounted ....... | 1,906,163 69 |
| Schedule D. | Overdrafts............ | 3,808 74 |
| Schedule E. | Stocks and bonds....... | 340,434 12 |
| Schedule F. | Mortgages owned ....... | 373,782 24 |
| Schedule G. | Real estate owned...... | 1,016,187 46 |
| Schedule H. | Due from banks, less offsets............. | 34,800 32 |
| Schedule I. | Cash items and cash on hand............... | 556,453 76 |
| Schedule J. | Furniture and fixtures.. | 57,825 00 |
| Schedule K. | Suspense and difference. | 4,901 91 |

$7,310,653 **56**

Appendix.  Collateral, consisting of real estate, title to which is in the name of the Onslow-Moore Company and the Essex and Lee Company ........ No value given.

The offsets referred to in Schedule H were not given in detail in the inventory itself either as to the amount or the name of the bank entitled to or claiming such offset, but the item " Due from Banks " appeared in a statement filed with inventory as $337,657.87 instead of as $34,800.32, and the difference, $302,857.55, is treated in that statement as an additional debit item, bringing the total assets to be accounted for up to the sum of $7,613,511.11.

In view of the very large amount of assets appearing by the superintendent's inventory as compared with the comparatively insignificant balance apparently remaining, after six years of liquidation, in the hands of the superintendent of banks, with which to pay the general creditors of the Union Bank; and in view of the mandate of the statute, requiring the court judicially to determine the amount of the dividend that should be paid by the superintendent, it became, in the judgment of the court, necessary to ascertain what disposition had been made of these assets by the superintendent of banks and his predecessors in office, and whether such disbursements or other dispositions as had been made of the assets had been made in accordance with law and the rights of the creditors.

It was foreseen that the discharge of this duty by the court itself, rather than by a referee, official or otherwise, would entail labor of unusual character upon the court, doubtless withdrawing the court from the discharge of some of the duties assigned to it, but the gravity of the situation, the public interests involved and the need for prompt action seemed to demand the effort.

It is not out of place in this connection to premise what I shall have to say presently with the statement that the learned counsel for the petitioner strongly urged upon the court, that the court should grant this

application merely upon being satisfied that the superintendent had now in his hands funds adequate to the payment of a dividend of five per centum as proposed; or else that the court should stop the present proceeding and require the starting of a general accounting covering all the proceedings of the present superintendent and his predecessors in office from April 4, 1910, to date, and, in such proceeding, cite all persons having any interest in the questions involved in such an accounting, including the superintendent's predecessors in office during that period. Neither of these suggestions was adopted by the court, the first, because, in the court's opinion, such a direction would not discharge the duty resting upon the court, as pointed out in the memorandum filed on April twenty-fourth; the second, because the court deemed that the delay in approving the payment of a dividend until after such an accounting would be avoided by directing the superintendent to furnish the court with statements showing in detail the receipts and payments of moneys and the administration of the assets of the Union Bank during the period of its liquidation. It was thought, too, that such a direction, if given, without reserve or qualification, in conjunction with an order granting the application to pay a dividend, out of a balance of cash on hand, might be claimed to be or construed as an approval or confirmation by the court of certain of the acts of the superintendents in question, which the court has no intention of approving in this way; whereas, if given, coupled with a denial of the application for approval of the dividend, it would work hardship to the creditors of the bank, by causing further delay in any disclosure of the acts and proceedings of the superintendents — no such disclosure having been made during the six years of official liquidation, as has already been pointed out — as

Supreme Court, July, 1916.          [Vol. 96.

well as further delay in the payment of the proposed dividend.

Having thus shown the procedure taken upon the present application, it may be advantageous, on the score of clarity of statement in connection with what will hereafter be said concerning the accounts, to consider such of the general principles governing the duties, rights and powers of the superintendent of banks in the liquidation of insolvent banks as seem to be pertinent to the situation here under discussion.

The statements of account, which have been furnished to the court at its request since the filing of the petition by the petitioner as hereinbefore set forth, establish, and as I think conclusively, a fundamental misapprehension by the superintendent of banks of the principles which, under the law as I construe it, should govern the liquidation of an insolvent bank. That such misapprehension exists is shown by the brief submitted to the court by the learned counsel to the superintendent upon this application. This brief or memorandum is filed herewith and marked Exhibit 10.

If what I shall hereafter show, by means of the statements of account, does not justify the conclusion just stated, then the gross and glaring injustice suffered by the creditors of this insolvent bank, after six years of liquidation by state officials, must be laid at the door of a vicious system established under the apparent sanction of the law.

The fundamental misconception which I have spoken of is as to the relation which the superintendent of banks bear towards the insolvent institution, its creditors and the court.

The statute, as I read it, treats the position and office of superintendent of banks in two distinct and unrelated aspects. In the first, the superintendent of

banks is an administrative state officer, exercising, pursuant to statute, the supervisory and visitorial powers conferred upon him, powers intended to be of very great usefulness to the community, in the licensing, regulation and closing of the institutions subject to his control.  While he is exercising these powers and occupying this status, his discretion is not the subject of judicial review, except in the few instances expressly pointed out in the statute.  This status continues with regard to each institution under his control so long as it remains solvent.  When or if the superintendent determines that any such institution is no longer solvent, and takes possession of it for the purpose of liquidation, then there springs up forthwith a new and different status which he occupies toward that institution, and there devolve upon him entirely new functions and duties different from those which he had previously discharged.

He instantly assumes the position of a " receiver," " a conservator," " a custodian and liquidator," a " mere conservator and liquidator," as it has been variously denominated by the courts.  From that moment, except as the statute expressly gives him power to do certain special things, he has no general power over the assets of the bank.  He becomes the arm of this court, which thenceforth is in ultimate control in its judicial capacity and not in any administrative sense, and he does not possess nor can he exercise any judgment or discretion on his own account.  He must apply to this court in the appropriate judicial district for instructions before he acts.  In other words, he possesses and can exercise just the same powers, discretion and control, and no more, as, before the present system was inaugurated, a receiver of such an institution, who had been appointed by the court, would have possessed and exercised.

This principle is of such vital moment in the present case that I shall refer to some authorities which, in my opinion, sustain it.

The decisions of primary importance in this connection were rendered in connection with this very banking institution. In the case *Matter of Union Bank, Appeal No. 2,* 147 App. Div. 593, the Appellate Division in this department, by a divided court, passed upon the status of this bank, and discussed the powers of the superintendent of the banking department under section 19 of the Banking Law, as it then existed. Justice Woodward, in his dissenting opinion, discussed the powers of the superintendent after taking possession of the institution, and said, among other things: " They made their examination prior to this time and found the delinquencies which justified the taking over of the property and business of this bank, and from that moment the rights of the corporation and the duties of the Superintendent are to be determined, not by section 8, but by those of section 19, and the provisions of section 8, giving power to the Superintendent to administer oaths and to compel the attendance of ' any such person for the purpose of any such examination ' is merely a power to elicit testimony which shall aid the Superintendent in determining whether a banking institution shall be taken into his possession, and has nothing to do with the duties required of him after the step has been taken and he enters into the possession of the property and business. These are fully provided for by section 19, and they require the sanction of the Supreme Court as to all matters of importance, because there are rights of property involved, presenting judicial questions which cannot be delegated to other than a judicial tribunal. * * * Section 19 continues: ' Upon taking possession of the property and business of such corporation or indi-

vidual banker, the superintendent, is authorized to collect moneys due to such corporation or individual banker, and do such other acts as are necessary to conserve its assets and business, and shall proceed to liquidate the affairs thereof as hereinafter provided.' The command of the statute is not that he shall investigate individuals or corporations as *heretofore* provided, but that he ' shall proceed to liquidate the affairs thereof as *hereinafter* provided.' His duties, aside from the discretion vested in him to permit the resumption of business if the corporation or individual desire it, are controlled by the after provisions of the statute, not those which precede the power to take possession. ' Upon taking possession of the property and business of such corporation or individual banker the Superintendent * * * shall proceed to liquidate the affairs thereof as hereinafter provided. The Superintendent shall collect all debts due and claims belonging to it, and upon the order of the Supreme Court may sell or compound all bad or doubtful debts, and on like order may sell all the real and personal property of such corporation or individual banker on such terms as the court shall direct; and may, if necessary to pay the debts of such corporation, enforce the individual liability of the stockholders. * * *

" ' If the Superintendent doubts the justice and validity of any claim, he may reject the same, and serve notice of such rejection upon the claimant either by mail or personally. * * *

" 'An action upon a claim so rejected must be brought within six months after such service. * * * Upon taking possession of the property and assets of such corporation or individual banker the Superintendent shall make an inventory of the assets of such corporation or individual banker in duplicate, one to be filed

Supreme Court, July, 1916.    [Vol. 96.

in the office of the Superintendent, and one in the office
of the clerk of the county in which the principal office
of such corporation or individual banker was located,'
etc.  Throughout the length of section 19 there are pro-
visions for dealing with the property and business of
the corporation or individual banker, but in none of
these are there any suggestions of a power to make
further examinations of the officers of the bank or of
the individual banker;    *    *    *

" Full provision is made for dealing with bad debts
and doubtful claims; full provision for the rejection of
doubtful claims against the bank, with a short statute
of limitations provided, in which such claims may be
asserted in the courts, and generally the affairs of the
bank are left to be adjusted by the Superintendent,
subject to the direction of the Supreme Court, in much
the same manner that a receiver would be authorized
to close up the affairs of the bank.  All doubtful ques-
tions are left for the court to dispose of, or at least to
supervise, and as the court has ample powers to secure
such evidence as may be necessary in disposing of any
of the matters which are within its jurisdiction, no
possible occasion can be suggested where the inquisi-
torial power asserted by the Superintendent would
be at all necessary in liquidating the affairs of the
bank.    *    *    *

" Would any one pretend that under the Banking
Law as it stood prior to 1908 (Chap. 143) there was
any authority in the Superintendent to examine into
the affairs of a bank after a receiver had been ap-
pointed and taken possession of the same upon his
recommendation?  If not, why should such a power be
vested in the Superintendent now?  The only change
in the law, in so far as it relates to the question here
under discussion, is that under the provisions of sec-
tion 19 (being a revision from the old section 18, as

amended by chapter 143 of the Laws of 1908) the Superintendent becomes in effect the receiver of the corporation, without the intervention of the Attorney General; his relation is changed from a supervising officer of a going concern to that of a receiver of an insolvent corporation, for the duties prescribed by the statute are those of a receiver in their essential elements, and all of the important functions, as in the case of a receiver, are to be performed under the sanction of the court. There was no occasion for such an examination as is now proposed under the receivership; there is no more occasion for it under the statute as it now exists. (See, also, Laws of 1910, chap. 452, amdg. said § 19.)''

Permission to appeal from this decision was granted and questions certified to the Court of Appeals. That court, by unanimous vote (204 N. Y. 313, 320), expressly concurred in the conclusions expressed in the dissenting opinion of Mr. Justice Woodward. Judge Werner, in his opinion, remarks, referring to section 19 of the Banking Law (p. 316), as follows: '' The most conspicuous feature of that part of the section which we have quoted is the particularity with which it enumerates the various things which must happen or exist before the Superintendent has any right to take possession of a bank. One or more or all of the conditions specified must exist and must ' appear to the Superintendent ' before he is authorized to exercise this drastic power. As we read the statute, it charges the Superintendent with the duty of investigation for the purpose of deciding whether it is his duty to take possession; but it gives him no power to take possession for the purpose of conducting a *post mortem* investigation. The title of the section, ' proceedings against and liquidation of delinquent corporations and individual bankers;' the context of that part which we

have quoted; the provisions which follow the quotation, and the conditions which brought about its enactment, all conspire to stamp this as a statute under which the Superintendent is empowered to take possession of a bank, not as a public inquisitor, but as a receiver and conservator of its assets. The events which led to its enactment are familiar history of which we may take judicial notice. The financial depression of 1907, and the resulting embarrassment of many banks, culminated in a series of receiverships in which the demands for commissions and counsel fees were so extravagant as to arouse an instant popular demand for reform. To that end the Superintendent of Banks was by statute invested with the powers which had previously been exercised by receivers appointed by the courts. That this was and is the nature and extent of the power conferred upon the Superintendent by section nineteen is clearly evidenced by its context. ' Whenever it shall appear to the Superintendent that any corporation or individual banker ' is doing business under the conditions forbidden by the statute, and which prior to 1908 would have authorized the appointment of a receiver, ' the Superintendent may forthwith take possession ' and retain it until there is a resumption of business or a final liquidation. The statutory enumeration of the Superintendent's duties which follow upon the taking of such possession very clearly indicates the legislative intent to transfer to the Superintendent the general duties and functions which had theretofore been exercised by receivers."

This section 19 was again considered by the Court of Appeals in *Van Tuyl* v. *Scharmann*, 208 N. Y. 53, and Judge Hogan, delivering the opinion of the court, quoted from Judge Werner's opinion in the *Union Bank* case, the matter last above set forth and continued: " The statute of 1908 expressly repealed all

acts and parts of acts inconsistent therewith, and in unmistakable language conferred authority upon the superintendent of banks, if necessary to pay the debts and liabilities of a trust company, to institute action in his official capacity to enforce the liability imposed upon the stockholders thereof by section 196 of the Banking Law, unhampered by any limitation contained in the Stock Corporation Law or the fact that the charter of the company had not been dissolved by judgment of the court. The scheme of the statute was to provide a procedure for the liquidation of delinquent corporations through a department of the state for the benefit of creditors, which would be economic and speedy." See also *Van Tuyl* v. *Schwab*, 165 App. Div. 412, and *Richardson* v. *Cheney*, 146 id. 689.

The Banking Law of the state, as amended by the revised Banking Law of 1914, worked no change in the principles governing the rights, duties and powers of the superintendent of banks in the liquidation of the affairs of insolvent banking corporations in respect of the control which this court exercises over the superintendent during the process of liquidation.

We have thus a perfectly plain enunciation by the courts of the duty resting upon the present superintendent and his predecessors in office in regard to the liquidation of the affairs of the Union Bank. As has been shown, he and they were, in all essential respects, and in so far as the assets of the insolvent bank were concerned, receivers of the property. It is true that they were, as argued by the superintendent's counsel, trustees of the property, holding it for the benefit of the corporation and its creditors, but there the similarity ends and they were not, like trustees of an express trust in real or personal property under the provisions of our laws, vested with wide discretionary power concerning the management and disposition of its assets and liable only for a breach of trust or mal-

feasance or misfeasance in the discharge of the duties imposed upon them as trustees. They were, except in the matter wherein they were given special powers by statute, mere custodians of the property and bound to deal with it as directed by the court. This involved the duty of " liquidating " the assets, ascertaining the validity of claims presented and paying the creditors. It clearly meant that if a mortgage or other form of obligation held by the bank matured they were to collect it either with or without suit and if it were finally ascertained to be uncollectible, then it became their duty to report that fact to the court and ask for instructions of the court as to the disposition to be made of it. It became their duty also to sell any real property which was owned by the insolvent institution. The duty rested upon them, before paying out any moneys which had come into their hands as assets of the insolvent corporation, to obtain the sanction and approval of the court and not to rely upon the individual judgment of the person who happened to occupy the office of superintendent of banks to decide, even though he acted in entire good faith, what payments were proper to be made in winding up the affairs of the bank.

The history of receiverships of banking institutions to which Judge Werner referred in his opinion as above is well known. They had involved long and costly processes of liquidation, and the expense had come out of the pockets of the general creditors of the insolvent institutions. For the most part, these general creditors were the unfortunate depositors, and upon their shoulders had fallen the burden of costly litigation, needless delay and extravagant management on the part of receivers selected — and sometimes unwisely selected — by the courts. It was to remedy these abuses that the present system was finally substituted, and the liquidation of the insolvent

banks was transferred from persons appointed by the courts to the official head of one of the great departments of the state government, namely, the superintendent of banks. If the case of the Union Bank is, as I have reason to apprehend it is, at all typical of other insolvent banking institutions which, since the change in the law concerning their liquidation, have come under the control of this department, the results in this case, as developed by the statements furnished to the court by the superintendent of banks, will, I believe, be found so startling as to make it imperatively necessary to repeal or radically amend the statutes under which conditions such as are herein shown can become possible and which I believe will be found to be far more costly and dilatory than under the former system.

The evolution of the present law to which reference has been made will be seen from the following brief review of the legislative enactments regulating the liquidation of insolvent banking institutions. There will be found in the Report of the Board of Statutory Revision, 1907 (Vol. 1, p. 263) an historical note covering the early policy of the state in the matter of granting and regulating the banking privilege. It will appear by this report that the Banking Law, as it was in that year submitted to the legislature as a part of the Consolidated Laws, was, in substance, the same as the Banking Law adopted in 1892 (Laws of 1892, chap. 689, Gen. Laws, chap. 37). It did not provide for a liquidation of the affairs of insolvent banking corporations by the superintendent of banks, but only (§ 18) that the superintendent, if he found it inexpedient for the institution to continue business, should communicate that fact to the attorney-general, who would thereupon institute such proceedings as were authorized by law in the case of insolvent corporations. But the legislature altered this situation before the Consoli-

dated Laws were enacted in 1909. The change was effected by chapter 143, Laws of 1908, which amended section 18 of the former Banking Law, and this became section 19 upon the adoption of the Consolidated Laws. This section then for the first time conferred upon the superintendent of banks the authority to liquidate the affairs of insolvent banking institutions.

Section 19 was amended in 1910 (Laws of 1910, chap. 452), and was revised in the present Banking Law Revision of 1914 (Laws of 1914, chap. 369), and is now comprised in sections 57 to 78, inclusive.

It may be instructive, in connection with the change in the functions of the superintendent in the liquidation of the affairs of insolvent institutions, to quote from two messages of former governors of this state to the legislature. See Messages from the Governors, Vol. X, pp. 352, 353. Governor Odell said, in 1902: ''Another very serious drawback to the administration of our laws is that affecting the insolvency of public or *quasi* public institutions. Many instances can be cited where if the assets of such corporations had been promptly administered at the lowest possible expenditure they would have been sufficient to have repaid in full the creditors and stockholders. Particularly is this true of banks, insurance companies and railroads. The federal statutes provide in the case of national banks that possession shall be taken by the comptroller of the currency and that the right to such possession shall not be dependent upon the ability of the comptroller's department to bring about a receivership through the action of the courts. The result has been that in many cases banks, which if otherwise administered would have paid but a small percentage to their stockholders and depositors, have been able to resume business or have gone into liquidation and distributed a percentage that has been satisfactory.

" The depositors in our banks and the policy-holders of the insurance companies of our State number into the hundreds of thousands. There is therefore nothing more important than that a careful watch should be exercised over these institutions. They should be placed entirely under the control of the State Banking and Insurance Departments, and our laws should be made to conform to the Federal statutes relating to National Banks. I am satisfied that excessive charges have been made by attorneys in the settlement of the affairs of such insolvent corporations, and while receivers are curbed by legislative enactment as to their charges, yet their expenditures figure but very little in the total expenditures for the liquidation of such corporations. As an illustration of the abuses arising under the present system of receiverships, it may be stated that the total expenses involved in the liquidation of the affairs of seventy corporations during the past ten years have been $1,666,223.84.

" I therefore recommend the amendment of the banking and insurance laws so as to provide that all proceedings affecting insurance and banking corporations under the control of the State Banking and Insurance Departments shall not only be instituted by such departments respectively, but that they shall be placed absolutely under their control during the liquidation. This would do away with the fees which are now excessive and would require the payment only by the corporation involved of the necessary expenses in the closing up of such organizations."

Governor Higgins, in 1906, said: " I recommend the consideration of the enactment of appropriate legislation looking to a more economical administration of the estates of defunct corporations which have been placed in the hands of receivers in actions brought by

21

Supreme Court, July, 1916.          [Vol. 96.

the people through the Attorney General upon reports
of the Insurance and Banking Departments. The
present system involves serious and needless expense
for receivers' and attorneys' fees which often falls
upon people of moderate means and results in real
hardship." Id. 845.

The legislature responded to the former of these
messages by passing the act entitled "An Act to sim-
plify the procedure, facilitate the settlement and
reduce the expenses of receivers on dissolution of
monied corporations." Laws of 1902, chap. 60. This
act was substantially re-enacted in the General Corpo-
ration Law (Consol. Laws, chap. 23, §§ 150–160), which
is applicable whenever the attorney-general shall com-
mence an action against a moneyed corporation for
the dissolution or sequestration of the property or
annulment of the charter of a corporation formed
under or subject to the Banking Law. These pro-
visions still remain without substantial change.

It is, of course, true that the courts are not concerned
with the wisdom of legislative enactments. If the stat-
ute be free from ambiguity and does not violate con-
stitutional limitations upon the legislative authority,
the only function of the courts is to enforce it; but
where, in the exercise of judicature, the court observes
that the legislative intent is being frustrated through
unwise or improvident administration, made possible
under the letter of the statute, it is not, I think, out of
place for the court to note the fact judicially for the
information of the law-making or law-enforcing
branches of the government. That such frustration
has been the unfortunate result in the present instance
seems to me to be established by the accounts furnished
to the court by the superintendent of banks.

It must be deemed to be the law, under the statutes
referred to, that the legislature has conferred upon the

superintendent of banks, under the conditions pre-
scribed by the statutes, the power to take possession of
the bank for the purpose of "liquidating the business
and affairs" of the corporation, and "he may hold
such possession until its affairs are finally liquidated
by him."

In its general sense liquidation means "the act or
operation of winding up the affairs of a firm or com-
pany by getting in the assets, settling with its debtors
and creditors, and apportioning the amount of  *  *  *
profit or loss" (3 Cent. Dict. 3474), and this is the
sense in which it is used in these statutes.

All these steps must, however, be taken subject to
the approval of the court, as I have already shown.

In view of the unfortunate consequences to the de-
positors whose moneys are in jeopardy by reason of
the closing of any banking institution, it is of primary
importance that the affairs of the bank be liquidated
with the minimum loss of time and at the least possible
expense. Especially is this true where, as in the pres-
ent instance, the state itself has through one of its
executive departments undertaken the task of liquida-
tion. It then becomes incumbent upon the chief of that
department to use that degree of skill, foresight and
diligence, which is commensurate with the powers
assumed, to safeguard the great interests committed
to his custody, pursuant to law. It is not correct to
assert that his duty is fully discharged by placing one
of his deputies in particular charge of the liquidation.
He cannot delegate to a subordinate the responsibili-
ties of his office. When he assumes the power to liqui-
date, he also assumes the corresponding burden. The
statute contemplates and public policy requires the
highest degree of fidelity on his part towards the state,
the depositors and shareholders of the institution of
which he has *sua sponte* taken possession. It clearly

points out to him that he is to take no important step affecting the interests committed to his keeping without the sanction of this court. If he obtain that sanction in the manner pointed out by the statute, it is absolute protection for him. If he proceed without it, he must suffer the consequences.

Let us now, in the light of what has been said, see in what manner the superintendent of banks and those of his predecessors who have been mentioned have, in the present instance according to the account presented, discharged the duties assumed by them.

As has been noted, the superintendent has submitted a number of statements containing the information requested of him by the court. These have been assumed by the court to show with accuracy the transactions of the superintendent and of his predecessors during the liquidation period of six years. Owing, doubtless, to the haste in their preparation for the use of the court they contain some errors in footings, omissions of page footings and transpositions of pages in the binding. This has imposed additional work on the part of the court; but, as a whole, the information called for was furnished by the superintendent and his counsel as promptly as could be expected for so great a task. It is comprised in over 500 sheets of figures.

In order to a complete understanding of the liquidation proceedings as they are contained in the several accounts it was necessary to consolidate the special accounts of the Metropolitan Holding Company and of the Shetland Company with the general account of the Union Bank. This I have done after examining exhaustively and critically each of the separate accounts. In this work I have, I regret to say, had no assistance whatever from the committee of depositors or their counsel. If they represented

all the depositors — which admittedly they do not —
and all other persons interested in the questions here
presented, the court might, in view of their attitude,
as shown by the minutes of the hearings, have given
its perfunctory sanction to the payment of the pro-
posed dividend without any further labor; but, as has
been shown, this would not have been a proper dis-
charge of the duties laid upon the court by the statutes.

The result of the consolidation which I have made,
showing the moneys received and paid out by the
superintendents during the six years of liquidation
of the Union Bank and its subsidiary corporations as
drawn from the accounts furnished, will appear by the
following:

CONSOLIDATED STATEMENT OF RECEIPTS AND DISBURSEMENTS OF
UNION BANK, SHETLAND COMPANY AND METROPOLITAN HOLDING
COMPANY.

Balances at opening of accounts, as follows:

| | | |
|---|---:|---:|
| Union Bank ..................... | $343,602 78 | |
| Metropolitan Holding Company..... | 3,917 84 | |
| Shetland Company .............. | 6,336 12 | |
| | | $353,856 74 |

*General Receipts:*

| | | |
|---|---:|---:|
| Demand loans, time loans and bills discounted .......................... | $1,933,212 85 | |
| Payments on account of mortgages owned: | | |
| Union Bank ......... $142,540 08 | | |
| Shetland Company ... 17,760 11 | | |
| | 160,300 19 | |
| Sale of furniture and fixtures ........ | 18,078 56 | |
| From stocks and bonds............ | 4,964 54 | |
| From stockholders' assessments ...... | 51,200 00 | |
| From overdrafts repaid ............. | 2,397 70 | |
| From interest .......... $40,182 25 | | |
| | 111,582 69 | |
| | 151,764 94 | |
| From collections due from banks, cash items and certificates of deposit..... | 497,406 95 | |

From collections made from persons
   liable on notes guaranteed by bank,
   paid by it and included in bills pay-
   able ............................    $1,287 59
Miscellaneous ......................    31,903 45
                                                                    $2,852,516 77

*Receipts, Real Estate:*
Borrowed on bond and mortgage......    $4,000 00
Bristol street .....................    23,010 54
Seventy-third street and Seventy-second
   street.........................    25,023 86
Return premium and other credits on
   carrying charges, etc..............    25,089 37
Miscellaneous items ................    5,483 91
Sales of real estate................    221,555 53
Telephone ..........................    1,270 63
Deposits to secure leases...........    9,500 00
Rent ...............................    1,058,342 82
                                                      1,373,276 66

Received from State of New York on account of
   expense of special investigation ................    8,337 87

     Total receipts ..............................    $4,587,988 04

*Disbursements.*
*General Expenses of Administration:*
Salaries and auditing................    $88,528 92
Supplies ...........................    6,390 82
Printing and stationery.............    2,367 49
Trucks, cabs, etc...................    593 40
Postage ............................    645 94
Surety bonds .......................    1,308 90
Rent of offices, etc................    14,836 45
Legal fees ............. . $79,193 95
And disbursements .....    11,034 81
                                      90,228 76
Telephone...........................    2,673 59
Storage.............................    3,624 15
Searches and appraisals.............    2,614 65
Miscellaneous.......................    180 05
Notary fees ........................    1,605 48
Tax on stock........................    7,587 67
                                      $223,186 27
*Expenses of special investigation*...............    8,356 17

*Payments made in connection with*
*    real estate:*

| | | |
|---|---:|---:|
| Repairs........................... | $174,949 | 21 |
| Interest.......................... | 577,845 | 43 |
| Taxes............................. | 354,435 | 49 |
| Power, light and heat.............. | 65,689 | 03 |
| Appraisals........................ | 1,539 | 36 |
| Advertising....................... | 1,089 | 82 |
| Janitors.......................... | 47,486 | 08 |
| Commissions....................... | 30,528 | 51 |
| Salaries.......................... | 22,554 | 73 |
| Dispossess........................ | 802 | 06 |
| Office rent ...................... | 162 | 50 |
| Stationery and printing........... | 515 | 79 |
| Miscellaneous..................... | 23,979 | 71 |
| Insurance......................... | 64,122 | 04 |
| Rent paid ........................ | 47,010 | 83 |
| Telephone......................... | 3,721 | 53 |
| L. Meyer, special account.......... | 8,545 | 75 |
| Rebates........................... | 175 | 00 |
| Paid account loans................. | 73,806 | 49 |
| Checks " N. G." returned........... | 2,303 | 00 |
| Recording fees, extension fees, etc.... | 4,509 | 31 |
| Invested in real estate............. | 87,886 | 62 |
| Capital Hall ..................... | 18,799 | 90 |
| Bristol Street ................... | 13,072 | 26 |
| Liberty Avenue Theatre ............ | 53,284 | 06 |
| Mortgages bought ................. | 36,300 | 00 |
| Paid on account of mortgage........ | 298,312 | 03 |

$2,013,426  54

*General Disbursements:*

| | | |
|---|---:|---:|
| Bills payable ......................$1,613,678 | 27 |
| Preferred depositors .................  · 98,787 | 50 |
| Items left for collection.............. 20,283 | 50 |
| To make good " N. G." checks...... 17,161 | 73 |
| Offsets allowed ................... 226,462 | 19 |
| Interest........................... 128,801 | 78 |

2,105,174  97

Total payments ...........................      $4,350,143  95

Balance.................................      $237,844  09

| | | |
|---|---|---|
| Balances, Union Bank account..................... | $227,892 | 52 |
| Shetland Company account............. | 5,835 | 45 |
| Metropolitan Holding Company account.. | ·4,116 | 12 |
| | $237,844 | 09 |
| Errors in addition in Shetland Company receipts... | $1,429 | 50 |
| Unexplained shortage, page 3, Exhibit 2.......... | 15 | 53 |
| | $1,445 | 03 |
| Cash balance shown by Exhibit 2................ | $227,876 | 99 |
| Cash balance shown by Shetland account.......... | 4,405 | 95 |
| Cash balance shown by Metropolitan Holding Company...................................... | 4,116 | 12 |
| | $236,399 | 06 |
| | $237,844 | 09 |

The foregoing statement is self explanatory, and it will well repay close scrutiny.

There are some matters in connection with the statements submitted which invite comment. The item included in general disbursements as " offsets allowed $226,462 19 " does not appear in the cash account submitted. The only explanation of it which I have received is contained in Exhibit 5 at page 1, where the following appears:

" *Demand Loans, Time Loans and Bills Discounted.*

" The $226,462.19, which is the difference between $1,933,212.85 appearing in Volume 2, page 2, and $1,696,750.66 the total amount of the demand loans, time loans and bills discounted in the summary statement on page 3, Volume 2, appears from the records of the bank to be offsets allowed, as all the cash col-

lected is accounted for in the statement of receipts. The details of these offsets are not available and cannot be prepared unless an extensive examination is made into the collection of each one of the items, and then I doubt whether it could be obtained as I am informed by the bookkeepers who were in the employ of the liquidation at that time that the record of these offsets was kept on scraps of paper, and the general bookkeeper only made collective entries for the offsets which were allowed from day to day. I understand, however, that they were only allowed to parties who were entitled to same by law. Mr. E. L. Dodge, the Special Deputy Superintendent who was in charge at the time these offsets were allowed, and Mr. Louis Goldstein, attorney for the liquidation the greater part of that time, will be able to give most of the information in connection with these offsets."

In the schedule of receipts and disbursements, Exhibit No. 2, page 3, appears an item "Advances to protect equities $405,245.59." An analysis of the items, however, shows that this total should be $405,292.57. Practically all of this amount was advanced to the Shetland Company or the Metropolitan Holding Company to cover carrying charges of the real estate standing in the names of those corporations and is carried in the statement of assets of the bank as of May 1, 1916, in addition to loans and bills discounted. In point of fact, as the bank owns all of the stock of the two corporations, and as the exhibit shows (Exhibit 5, pages 4 and 6) that the stocks of these corporations are supposedly worthless, it would seem to be misleading to carry this amount as an asset of the Union Bank.

Having, as thus appears, ascertained the total

amount of cash which was collected by the superintendents of the banking department in the liquidation of the Union Bank and having shown what disposition they have made of the cash so received, it only remains, for the purposes of the present inquiry, to discuss certain matters connected with the expenses of the liquidation by the superintendents of banks. This may best be done under three heads, viz.:

1. Expenses of administration.
2. Legal expenses.
3. Real estate and mortgage payments and expenses.

## 1. EXPENSES OF ADMINISTRATION.

As shown above, the office expenses amounted to $132,957.51 exclusive of legal expenses. None of this expense has received the approval or sanction of the court either in advance of the payment or subsequently. On pages 88 to 118 of Exhibit 2 this very large amount, paid out without the sanction of the court, embraces many items which would appear to require careful scrutiny, but that can be given to them at another time. Attention is called to them now to emphasize the entirely unrestricted and uncontrolled manner in which the superintendents have treated this branch of administration, expending the funds in their hands with entire freedom and without obtaining the approval of the expenditures by the court in the manner clearly contemplated by the statute.

## 2. LEGAL EXPENSES OF THE ADMINISTRATION.

The schedule of legal fees and disbursements contained on page 19 of Exhibit 5 is as follows:

" LEGAL FEES AND DISBURSEMENTS.

*Summary.*

|  | Total | Fees | Disbursements |
|---|---|---|---|
| Rollins & Rollins | $28,745.24 | $26,000.00 | $2,745.24 |
| Louis Goldstein | 26,488.49 | 21,450.00 | 5,038.49 |
| Joseph G. Deane | 24,382.31 | 22,900.00 | 1,482.31 |
| Philip Brennan | 630.15 | 500.00 | 130.15 |
| Charles Burstein | 1,912.53 | 1,912.53 | |
| L. & C. Burstein | 100.00 | 100.00 | |
| W. A. Barber | 250.00 | 250.00 | |
| Geo. W. Offut | 50.00 | 50.00 | |
| E. L. Quackenbush | 109.83 | 109.83 | |
| Miscellaneous | 1,638.62 | | |
|  | $84,307.17 | $73,272.36 | $11,034.81 " |

There should, however, be two additions made to this list:

| Strauss & Anderson | $5,545 84 |
|---|---|
| Larkin & Lehman | 375 75 |
| Bringing the total up to | $90,228 76 |

With one exception, that of Strauss & Anderson, none of these payments has been submitted to or approved by the court. In addition to these, Louis Goldstein still has an unsettled claim of $18,500 as already mentioned. It may be true that services of the value represented by these figures have been rendered by the attorneys who have been employed from time to time by the superintendents of banks in the liquidation of this corporation, but from the cursory examination which I have been able to make of the work which they have performed, much of it was of a routine character; much of it represented services which were unsuccessful and unproductive of results

and much of it was incidental to the delays of administration accruing out of the retention of the real estate belonging to the Union Bank and its subsidiary corporations. The system of engaging private counsel to aid the superintendent in the liquidation of these insolvent banks on a salary basis may have its merits, but it is also attended with the danger of extending the period of service unduly without regard to the results accomplished. What has already been said with regard to the uncontrolled character of the expenditures under the head of "Expenses of Administration" is also applicable to the facts developed in this case with regard to the employment of counsel. As has been said, the court has never been asked, except in the instance mentioned above, so far as it has been able to ascertain from the statements of counsel or its own investigation of the records of the court, to approve the payments, although the statute clearly requires it. It is true, of course, that the court can sanction afterwards what it might have approved in advance, but there is the danger that after the lapse of so long a period of time the court might, for lack of precise and adequate information, sanction in certain cases allowances to counsel which it would not have approved if it had been asked to give its approval in advance.

In addition to the general objection arising out of the failure to obtain the court's approval to these legal expenses, there is a special criticism which should be made with regard to the payments to Mr. Louis Goldstein which applies during almost the entire period in which he was receiving a salary from the superintendent of banks. He was from about January 1, 1912, and still is occupying the position of an assistant district attorney in the county of Kings.

It appears from the accounts that Mr. Goldstein received monthly payments beginning on October 18,

1911, in the Van Tuyl administration, and continuing down to April 1, 1915, in the present administration. These payments were, for the first year, $500 a month and thereafter $600 a month, and, as shown by the accounts, reached the total of $21,450 as fees, besides $5,038.49 as disbursements. The record is silent as to whether, while drawing salary from the superintendent of banks, Mr. Goldstein was also drawing salary as an assistant district attorney for the county of Kings. The assumption, in the absence of any other proof, is that he did. If and in so far as the services which he performed for the salary paid by the superintendent of banks had relation to the discharge of his duties as an assistant district attorney of Kings county, the payments were illegal.

It is too well settled, by a long line of authorities in this state, to admit of doubt that a public officer shall not receive extra compensation outside of or beyond his fixed compensation for services imposed by law. The Court of Appeals, in *Carpenter* v. *Taylor,* 164 N. Y. 171, 178, 179, declared that where a statute prohibits a person to ask or receive compensation for services in an official or trust capacity greater than prescribed by law, an agreement to pay such compensation carries no binding obligation and such an agreement is invalid on the ground of public policy. See also *Hatch* v. *Mann,* 15 Wend. 44, which held that there can be no recovery of extra compensation for extra services, even though services beyond what could legally be required are rendered by the officer. See also *Matter of Pinney,* 17 Misc. Rep. 24, per Gaynor, J.; *Matter of Mahon* v. *Board of Education,* 68 App. Div. 154; affd., 171 N. Y. 263; *McCarthy* v. *Bonynge,* 12 Daly, 356; affd., on opinion below, 101 N. Y. 668.

It was held by the Appellate Division in this department in *People* v. *Sutherland,* 147 App. Div. 668, that an

Supreme Court, July, 1916.    [Vol. 96.

audit by the board of supervisors of the account of the county clerk which contained illegal items could not, in the absence of fraud, be recovered in an action by the People after the payment of such illegal items and such audit. This decision, however, was reversed in the Court of Appeals (see 207 N. Y. 22), and it was there held that the audit of the illegal items did not prevent their recovery. Of course, in the present case, there has been no such audit. There are numerous other cases in this state which sustain the principle referred to, but, as I am not now passing upon the validity of the payments, but only ascertaining the fact of the payments, the authorities already cited will suffice.

In this connection, reference may be made to the special investigation conducted by Mr. Dodge, deputy superintendent of the banking department, into the affairs of the Union Bank in the year 1911. In that investigation, the minutes of which comprise over 3,200 pages of testimony, Mr. Goldstein acted as counsel, and the expense of the investigation amounted, as shown by the summary statement above, to $8,356.17; of this amount a part was paid to Mr. Goldstein. (See page 24, Exb. 5.) All of this, except a few dollars, was returned to the account of the Union Bank by the state of New York. Much of the information elicited in the course of that investigation was obtained for the purpose of the prosecution of criminal proceedings in Kings county in relation to the conduct of the Union Bank before its insolvency.

3. REAL ESTATE EXPENSES AND PAYMENTS.

By reference to the consolidated statement above, it will be seen that the superintendents of banks in charge of this liquidation have expended during the six years

of their administration a total sum of $2,013,426.54 in connection with the real estate owned by the Union Bank and its subsidiary companies. As appears by the consolidated statement, the superintendents have received from real estate during the period covered the sum of $1,373,276.66. These $2,000,000 have been invested in or disbursed on account of real estate either, as shown by the consolidated statement, in repairs, interest, taxes, insurance, salaries, commissions, advertising, appraisals, rentals, telephone service and other charges for the carrying of the real property or in the purchase of mortgages or payments on account of mortgages upon the property owned.

The difference between the receipts and the expenditures is thus seen to be the sum of $640,149.88. Whether any substantial part of this deficit can be recovered upon the sale of the real estate still owned is a matter to which I have given as great attention as was possible in the time available. I have secured appraisals upon many of the parcels of real property which are mentioned in the accounts, and am free to say that the equity therein of the Union Bank is, in my judgment, of doubtful value. In this connection, I may say it is wholly beyond my own comprehension how the superintendent of banks and his predecessors in the office could justify the holding of the real estate of the Union Bank and its subsidiaries for the long period of time which has elapsed since they took charge of its affairs. At that time (1910), it is true, the real estate market was, to some extent, suffering from the great depression which occurred in the year 1907, but I am satisfied that, in the case of almost every parcel of real property which came under the control of the superintendent in 1910, if it had been promptly disposed of, it would have realized quite as much if not more than can be gotten for it to-day. Instead of

doing this, however, it was the policy to hold on to this real estate with the result ultimately of incurring this large loss, requiring the absorption of so much of the liquid assets of the insolvent corporation. Instances are shown by the accounts where payments were made on account of mortgages (and this item alone amounted in the aggregate to $298,312.03) and subsequently the property on which the payment was made was lost through the foreclosure of a superior mortgage lien. Not only was this so, but mortgages were purchased to the extent of $36,300, and in addition $87,886 were invested in the purchase by the superintendent of real estate outside of the payments made on account of Capital Hall, $18,799.90, Liberty Avenue Theatre, $53,284.06, and Bristol street, $13,072.26. If one were to judge by an examination of the voluminous accounts submitted showing the management of the real estate, it would appear as if the insolvent corporation had been exclusively engaged in that business instead of being a bank of deposit which, under the law, is prohibited from holding or owning real estate except in the limited way permitted by the statute. The policy of the law relating to the banks of this state, and especially to banks of deposit, is that the assets should be carried in a liquid form, that is, in a form readily convertible into cash. Unfortunately for the depositors, that policy was not followed in the case of the Union Bank, and the result was that when it was closed there was a large amount of real estate of greater or less value, most of it encumbered for all or nearly all of its worth, which came into the hands of the superintendent. But we are not now concerned with the management of the bank before it failed. We are very much concerned with its management afterwards.

Bearing this statutory provision and wise principle of banking in mind, it was, I think, the duty of the superintendent at that time, and it became more and more his duty and that of his successors as time elapsed, to " liquidate " its real estate and not to pile up, by its retention, a deficit which had to be met out of the other assets of the insolvent bank. And especially was this so in view of the investigation, to which reference has already been made, conducted by Mr. E. L. Dodge, formerly deputy superintendent of banks, into the affairs of this bank, because, I think, that investigation was sufficient to show that these real estate assets were of doubtful value. Apparently, however, the superintendents in successive charge have adhered to a different policy. I have been at some pains to examine the reports which the law requires the superintendent of the banking department to make to the legislature to ascertain if, in the past six years, the superintendents have reported upon this phase of their management of the affairs of the Union Bank, but, although the search has been exhaustive, I do not find any such report, although there are some indefinite references which throw no light on the subject. I have also been unable to find that this phase of the liquidation has ever been submitted to the Supreme Court for its judicial sanction, although the statute very clearly, as I read it, authorizes the superintendent of the banking department to apply to the court for instructions in this regard. It is my deliberate judgment that the legislature never intended that the banking department, under the guise of liquidating the assets and affairs of an insolvent bank, should engage in the business of managing and handling real estate belonging to the institution and carry on that business indefinitely, especially where the net result of such manage-

ment was to use up the greater part of the liquid assets of the institution which ought to be available for the payment of the depositors and other creditors of the bank.

It may perhaps be urged that the legislature has changed the powers of the superintendent in the matter of making application of the personal assets to the carrying of real property and that it rests in his uncontrolled discretion under the present law; but I do not so construe the legislative intent as expressed in the statute.  I am not unmindful of the difference in phraseology between the former and the present Banking Law.  Section 19 of the Banking Law of 1909 said: '' Upon taking possession of the property and business of such corporation or individual banker the superintendent is authorized to collect moneys due to such corporation or individual banker, and do such other acts as are necessary to conserve its assets and business, and shall proceed to liquidate the affairs thereof as hereinafter provided.''

In the revised Banking Law of 1914, section 69, the statute reads: '' The superintendent is authorized, upon taking possession of the property and business of such corporation or private or individual banker or personal loan broker, to liquidate the affairs thereof and to do all acts and to make such expenditures as in his judgment are necessary to conserve its assets and business.  He shall proceed to collect the debts due.''

If there is any difference in the legislative intent as expressed in these two sections it is too obscurely stated to warrant the court in assuming that by the change of language the legislature intended a reversal of policy as to the supervision of this court.  I do not say that that thought might not have entered the mind of the draftsman of the revision of 1914, nor that the

legislature in adopting, as it did in bulk, a voluminous revision, did not overlook this particular point, concealed as it was in a complex and highly technical statute. But, even conceding for the moment that there was such a purpose on the part of the draftsman and legislature, it does not affect the present case. The revision of 1914 went into effect on April 16, 1914, which was four years after the superintendent took charge of the Union Bank, and it is expressly stated to be a continuation of the former Banking Law. It was clearly not retroactive in its provisions nor can it be urged as a justification for the pouring out of the funds which ought to have gone to pay the depositors of this bank, in the unwise attempt that has been made to retain the real property to their detriment. Even good faith on the part of the superintendent of banks cannot justify the wasting of the assets, although it may relieve him from personal liability. If the change in phraseology does work this insidious change in the legislative policy, the sooner it is annulled by the legislature the better it will be for the credit of the law-making body and the banking department.

The conclusions which I have arrived at as a result of what has been said can now be stated. I shall not here attempt any further comment upon the management of the affairs of the Union Bank, while in the hands of the several superintendents of the banking department in the process of this so-called liquidation. The figures speak for themselves; they require no characterization from the court.

*First.* The liquidation should be completed without further delay. The period which has already elapsed since the bank passed into the hands of the superintendent should have been amply sufficient to wind up the affairs if the officials in charge of the liquidation

had used due diligence. By that term, I mean that degree of despatch which a person of ordinary intelligence would employ in settling the affairs of a trust in his hands, where the object to be attained was the payment of the debts and the distribution of the assets to those entitled thereto.

*Secondly.* To this end, I, therefore, direct the superintendent to sell, either at public auction or by private contract, before the end of September, 1916, all the unsold real property of the Union Bank including all the property belonging to it but carried in the names of its subsidiary corporations.

*Thirdly.* I direct him to institute at once foreclosure proceedings of any mortgages now held which are in default as to principal, interest or taxes, and as to which such proceedings have not, as yet, been begun.

*Fourthly.* I direct that he sell all securities still held as part of the assets of the bank, including all choses in action, judgments or other personal property. Where such securities are pledged as collateral to loans, the right, title and interest held by the superintendent should be sold.

*Fifthly.* I authorize the superintendent of banks to declare out of the funds remaining in his hands after the payment of expenses a dividend to the general creditors in the amount of five per centum upon their claims as proved, including in this direction any claims which may be allowed by him to the date of such payment.

Ordered accordingly.